UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                               :
NEWMAN MYERS KREINES GROSS HARRIS, P.C.,   :
                                                               :           13 Civ. 2177 (PAE)
                                          Plaintiff,           :
                                                               :           OPINION & ORDER
              -v-                                              :
                                                               :
GREAT NORTHERN INSURANCE CO.,                                  :
                                                               :
                                          Defendant.           :
                                                               :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      This diversity action arises out of the widespread power outages that occurred in and around New York City during and after Hurricane Sandy. On October 29, 2012, in anticipation of storm-related flooding, utility provider Consolidated Edison Co. of New York, Inc. ("Con Ed") preemptively shut off power to certain of its service networks, to preserve the integrity of the utility system. As a result, plaintiff Newman Myers Kreines Gross & Harris P.C. ("Newman Myers"), a law firm, was without power at its lower Manhattan office for several days. Newman Myers filed a claim under its property insurance policy (the "Policy"), issued by defendant Great Northern Insurance Company ("Great Northern"), for loss of business income and extra expenses occasioned by its inability to access its office during the power outage. Great Northern denied the claim on the ground that Newman Myers did not suffer a covered loss under the Policy. Newman Myers brought suit against Great Northern in New York State Supreme Court, alleging breach of the parties' insurance contract. Great Northern removed the action to this Court.

      Before the Court now are the parties' cross-motions for summary judgment. For the reasons that follow, Great Northern's motion is granted and Newman Myers's motion is denied.

1

I.    **Background**[1]

    A.    **The Parties**

Newman Myers is a law firm with its office and principal place of business at 40 Wall Street, New York, New York 10005 (the "40 Wall Street Building"). Stip. Facts ¶¶ 1−2.

Great Northern is an insurance company incorporated under the laws of Indiana, with its principal place of business in New Jersey. *Id.* ¶ 3.

    B.    **Facts**

At all relevant times, Con Edison was responsible for supplying electrical power services to the 40 Wall Street Building. In late October 2012, as Hurricane Sandy headed toward the New York metropolitan area, Con Ed identified power supply and distribution centers that potentially could be damaged by flooding. It monitored those centers as the storm approached. *See* Stip. Facts Ex. X2 (Con Ed Report on Preparation and System Restoration Performance: Sandy, October 29 through November 12, 2012), at 5.

At around 6:42 p.m. on October 29, 2012, floodwaters began to rise. Before the stations could flood, Con Ed preemptively shut off the power to three utility service networks, including the Bowling Green Network, which provided service to the 40 Wall Street Building. *Id.* at 6−7. Con Ed did so because, were power to remain on in the event of a flood at a power distribution center, the ensuing damage to Con Ed's equipment would be much worse than if the power had been shut off. Shutting off the power thus preserved the integrity of the utility system, allowing power to be restored to affected areas more quickly following the storm. *See id.* at 5−7.

---

[1] The Court's account of the underlying facts of this case is drawn primarily from the parties' Joint Stipulation as to Record on Rule 56 Motions ("Stip. Facts") (Dkt. 16), and exhibits attached thereto. Citations to the parties' 56.1 Statement incorporate by reference the documents cited therein.

As a result, the 40 Wall Street Building was without full power from October 29 until November 3, 2012.  During that time, there was no electricity or elevator service in the building.  Stip. Facts ¶¶ 27−29, 35.  Although access to the building was not formally blocked, *id.* ¶ 30, Newman Myers employees reported trying to enter the building on November 1 and 3, only to be informed that "the Building was closed due to a loss of power and that building management was waiting for Con Edison to fully restore electricity," *id.* ¶ 34; *see also id.* ¶ 32.  Accordingly, Newman Myers treated the building "as being closed to tenants."  *Id.* ¶ 30.

On November 3, 2012, power was partially restored to the 40 Wall Street Building, and elevator service was restored up to the eighth floor.  *Id.* ¶ 33.  Power and elevator service were fully restored to the building on November 4, 2012.  *Id.* ¶ 35.  Newman Myers resumed normal business operations on November 5, 2012.  *Id.* ¶ 36.  The 40 Wall Street Building itself did not sustain any flooding or physical damage during the storm.  *Id.* ¶ 13.

On or about November 13, 2012, Newman Myers filed a claim under its commercial property insurance policy with Great Northern, for loss of business income and extra expenses it had incurred as a result of the loss of power to its office between October 29 and November 3, 2012.[2]  *See* Stip. Facts Ex. D (Law Firms Insurance Program for Newman Myers Kreines Gross Harris PC, Policy Number 3529-50-45 ECE ("Policy")) at CC 00057; *see also* Stip. Facts ¶¶ 10, 37.  The Policy provides coverage, under specified circumstances, for loss of business income and extra expenses occasioned by "direct physical loss or damage."  *See* Policy at CC 00108–00123 ("Business Income With Extra Expense Insurance For Law Firms").  This coverage is

---

[2] The Policy's Coverage Summary lists "14 WALL ST" as the insured premises, *see* Policy at CC 00057, rather than 40 Wall Street, although the parties agree the insured premises were 40 Wall Street.  *See, e.g.*, Stip. Facts ¶¶ 2, 10.  In light of the parties' agreement, the Court treats the coverage summary as erroneous and treats the covered premises as 40 Wall Street.

3

subject to several exclusions, including for loss or damage caused by flood. By letter dated December 26, 2012, Great Northern advised Newman Myers that its claim would be denied because, in the insurer's view, Newman Meyers had not suffered a covered loss. Stip. Facts ¶ 43; *Id.* Ex. T.

### C. Procedural History

On February 27, 2013, Newman Myers filed this action in New York State Court. *See Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.*, Index No. 151774/2013 (N.Y. Sup. Ct.) (filed Feb. 27, 2013); Dkt. 1 ("Notice of Removal") ¶ 1. Newman Myers's Complaint alleges, *inter alia*, that Great Northern breached the insurance contract by refusing to pay for covered losses under the Policy, to wit, loss of business income and extra expenses resulting from Newman Myers's inability to access its office between October 29 and November 3, 2012. *See* Dkt. 1 Ex. 1 ("Compl."). The Complaint seeks "a declaration that the Great Northern Policy affords coverage to Newman Myers for its loss of business income, expenses, costs and attorney's fees and interest from the date of loss which is in excess of $125,000," *id.* ¶ 48, as well as damages, *id.* ¶ 53.

On April 2, 2013, Great Northern removed the action to this Court, based on diversity jurisdiction. Notice of Removal ¶ 3. On January 7 and 8, 2014, respectively, the parties cross-moved for summary judgment, Dkt. 18, 22, and filed supporting memoranda of law, Dkt. 21 ("Def. Br."), 23 ("Pl. Br."). On January 28, 2014, the parties filed memoranda of law in opposition. Dkt. 24 ("Pl. Opp. Br."), 26 ("Def. Opp. Br."). On February 14, 2014, the Court heard argument.

## II. Legal Standard

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because "conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003)).

## III. Discussion

The sole issue presented by the parties' cross-motions for summary judgment is whether Newman Myers suffered a covered loss under the Policy as a result of the power outage at its 40 Wall Street office. This is a pure question of law for the Court. There are no material factual

5

disputes, as counsel for both parties agreed at argument.  *See* Dkt. 30 (Transcript of February 14, 2014 Oral Argument ("Tr.")) 2–5.  The Court need only determine whether the Policy language permits recovery under the undisputed facts.[3]

The Court will address the parties' competing arguments as to this issue after reviewing the applicable principles of New York insurance law.[4]

### A.     New York Insurance Law

"The initial interpretation of a contract is a matter of law for the court to decide." *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000) (internal quotation marks, alteration, and citation omitted).  Under New York law, "an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract." *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) (internal quotation marks and citations omitted).  "Where the provisions of a policy are clear and unambiguous, they must be given their plain and ordinary meaning, and courts should refrain from rewriting the agreement." *Roundabout Theatre Co. v. Continental Cas. Co.*, 302 A.D.2d 1, 6 (1st Dep't 2002) (internal quotation marks, alteration, and citation omitted); *see also Parks Real Estate Purchasing Grp.*, 472 F.3d at 42 ("When the provisions are

---

[3] Newman Myers objected to the admissibility of certain documents submitted by Great Northern in support of its summary judgment motion, *see* Tr. at 7–8; *see also* Dkt. 28, but those did not give rise to disputed issues of material fact relevant to the resolution of the parties' cross-motions for summary judgment.

[4] Although the parties' briefs do not directly address choice of law, they apply New York law, *see, e.g.*, Pl. Br. 8, Def. Br. 8−10, and it is clear that New York law governs.  The Policy was executed in New York, on behalf of a New York-based entity, and covers property in New York. *See* Compl. ¶¶ 1−4.  *See Philadelphia Parking Auth. v. Federal Ins. Co.*, 385 F. Supp. 2d 280, 285 (S.D.N.Y. 2005) ("'New York courts seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute.'") (quoting *Brink's Ltd. v. South African Airways*, 93 F.3d 1022, 1030 (2d Cir. 1996)).

unambiguous and understandable, courts are to enforce them as written.") (citing *Goldberger v. Paul Revere Life Ins. Co.*, 165 F.3d 180, 182 (2d Cir. 1999)); *Essex Ins. Co. v. Laruccia Constr., Inc.*, 71 A.D.3d 818, 819 (2d Dep't 2010) (under New York law, courts must give "unambiguous provisions of an insurance contract . . . their plain and ordinary meaning").

"It is well settled that '[a] contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *White v. Cont'l Cas. Co.*, 9 N.Y.3d 264, 267 (2007) (quoting *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (2002)) (brackets in original, additional citation and internal quotation marks omitted). Conversely, "[a]n ambiguity exists where the terms of an insurance contract could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Parks Real Estate*, 472 F.3d at 42 (quoting *Morgan Stanley Grp.*, 225 F.3d at 275) (additional citation and internal quotation marks omitted).

It is "well-established . . . that a policyholder bears the initial burden of showing that the insurance contract covers the loss." *Roundabout Theatre Co.*, 302 A.D.2d at 6. If, however, the policyholder carries this burden, the "insurer bears the burden of proof" to demonstrate "that an exclusion in the policy applies to an otherwise covered loss." *Morgan Stanley Grp.*, 225 F.3d at 276 n.1.

### B. Newman Myers' Claim of Coverage

The threshold question on the parties' cross-motions for summary judgment, therefore, is whether Newman Myers has carried its burden of showing that the Policy provides coverage for

its claimed losses. Specifically, Newman Myers seeks compensation for loss of business income and extra expenses incurred as a result of its inability to access its office between October 29 and November 3, 2012, during the power outage at the 40 Wall Street Building brought about by Hurricane Sandy.

As to this issue, the decisive question is whether the insured premises experienced "direct physical loss or damage." The Policy's "Business Income With Extra Expense Insurance For Law Firms" section provides the insured coverage for loss of business income and extra expenses in the event of "direct physical loss or damage by a covered peril to property." Policy at CC 00108. And the Policy's other business impairment coverage provisions, which provide additional coverage for loss of business income and extra expenses in specified circumstances, are subject to similar qualifications. Newman Myers appears to claim coverage under two such provisions: the "Ingress And Egress" provision and the "Loss of Utilities" provision. The Ingress And Egress provision affords additional coverage for business income loss or extra expense due to the impairment of business operations "when existing ingress to or egress from a premises shown in the Declarations is prevented due to direct physical loss or damage by a covered peril to property at a location contiguous to such premises." Policy at CC 00109 (bold face omitted). Similarly, the Loss of Utilities provision affords additional coverage for loss of business income and extra expenses due to a business interruption that is "caused by or result[s] from direct physical loss or damage by a covered peril to: building; personal property of a utility located either inside or outside of a building; or service property" necessary to provide the insured premises with, *inter alia*, "power supply." *Id.* at CC 00113−14 (bold face omitted). Thus, under all relevant provisions, a "direct physical loss or damage" is a condition precedent to Newman Myers' recovery.

Newman Myers concedes that its office at 40 Wall Street did not sustain any structural damage as a result of Hurricane Sandy. *See* Stip. Facts ¶¶ 13, 14. Newman Myers nevertheless argues that both its office at 40 Wall Street and the Con Ed facility at Bowling Green suffered "direct physical loss or damage" within the meaning of the Policy. It contends that the phrase "direct physical loss or damage," construed in line with the reasonable expectations of the insured, does not require actual structural damage to the covered premises. Instead, it argues, there need only have been "an initial satisfactory state that was changed by some external event into an unsatisfactory state." Pl. Opp. Br. 13 (internal quotation marks omitted). Here, Newman Myers argues (1) the "cessation of electrical services to 40 Wall Street can reasonably be interpreted as 'direct physical loss or damage'" because it made "ingress to and egress from the 26th floor of 40 Wall Street impossible," Pl. Br. 9 (bold face omitted); and (2) "[t]he Con Edison Facility at Bowling Green sustained a 'direct physical loss or damage' in the week that followed Hurricane Sandy" because the "threat of structural damage" posed by the anticipated flood transformed the facility from "an initial satisfactory state . . . into an unsatisfactory state," Pl. Opp. Br. 15 (bold face omitted).

In arguing that the policy term "direct physical loss or damage" is met by the preemptive closure of its building in preparation for a coming storm, Newman Myers relies on several out-of-state decisions. Each held the presence of fumes or noxious gas in a workspace to be "direct physical loss or damage," because the property at issue was rendered unusable or unsatisfactory for its intended purpose. In *TRAVCO Ins. Co. v. Ward*, 715 F. Supp. 2d 699 (E.D. Va. 2010), *aff'd*, 504 F. App'x 251 (4th Cir. 2013), the plaintiff sought coverage under its homeowners insurance policy for damages allegedly caused by defective drywall that released sulfuric gas into the premises. The policy provided coverage for "direct physical loss to property," but did

not define this term. Applying Virginia law, the court held that the insured had suffered a covered loss under the policy. It reasoned that "physical damage to the property is not necessary, at least where the building in question has been rendered unusable by physical forces." *Id.* at 708; *see also Essex v. BloomSouth Flooring Corp.*, 562 F.3d 399, 406 (1st Cir. 2009) (under Massachusetts law, unpleasant odor rendering property unusable constitutes physical injury to property); *Motorists Mutual Ins. Co. v. Hardinger*, 131 F. App'x 823, 825–27 (3rd Cir. 2005) (under Pennsylvania law, contamination of well water constitutes "direct physical loss" to house if it rendered it unusable). Similarly, in *Murray v. State Farm Fire & Cas. Co.*, 203 W.Va. 477 (1998), the Supreme Court of Appeals of West Virginia held that the term "direct physical loss" in a homeowners insurance policy "requires only that the property be damaged, not destroyed. Losses covered by the policy, including those rendering the insured property unusable or uninhabitable, may exist in the absence of structural damage to the insured property." *Id.* at 493. In *Murray*, the policyholders sought coverage for, *inter alia*, a "rockfall" in the area surrounding their homes. Although the rockfall did not cause structural damage to the insured premises, the court reasoned that the policyholders had suffered "direct physical loss" because the threat it revealed of future rockfalls made living in their homes untenable. *See id.* at 480–82, 492–93.

Newman Myers's cases are, however, distinguishable. In each there was some compromise to the physical integrity of the workplace. To be sure, the cases involving odors, noxious fumes, and water contamination did not involve tangible, structural damage to the architecture of the premises. But the critical policy term at issue, requiring "physical loss or damage," does not require that the physical loss or damage be tangible, structural or even visible. The invasions of noxious or toxic gases in *TRAVCO* and *Essex*, rendering the premises unusable or uninhabitable, were held to suffice, because even invisible fumes can represent a form of

10

physical damage. The contamination of well water in *Hardinger*, similarly involved physical damage, just not structural—there, to the building's water supply. Finally, the rockfall in *Murray*, although itself not having struck the premises, revealed a palpable future risk of physical damage, from another rockfall. Whether or not these cases were each correctly decided, each involved the closure of a building due to either a physical change for the worse in the premises (*Travco*, *Essex*, or *Hardinger*) or a newly discovered risk to the its physical integrity (*Murray*). Those characteristics are not presented by Con Ed's preemptive decision to shut off power to several utility service networks in order to safeguard its own system and equipment.

More apposite is New York case authority, and it favors the insurer here.[5] Most germane is *Roundabout Theatre Co.*, *supra.* There, a New York City theater company was forced to cancel 35 scheduled performances of "Cabaret" when its theater was rendered inaccessible to the public for several weeks by a municipal order closing the street for safety reasons. 302 A.D.2d at 2−3. The order had been imposed following a construction accident at another building in the area, which had not caused physical damage to the theater itself that would have forced the theater to close. *Id.* at 3. The theater company filed a claim under its property insurance policy for business income losses occasioned by the cancellation of the shows, *i.e.*, ticket and production-related sales, as well as additional expenses incurred in reopening the production. Like the policy at issue here, the policy there required as a condition precedent to recovery for business income loss "direct physical loss or damage" to the insured's property. The insurer denied coverage on the ground that, *inter alia*, there had been no such loss to the insured

---

[5] At argument, Newman Myers' counsel conceded that no New York cases involving a policy term requiring "physical loss or damage" support its position. *See* Tr. 12, 13.

premises as a result of the off-site construction accident that prompted the municipal shutdown order. *Id.* at 4.

The theater company brought suit, and, initially, was awarded summary judgment in New York State Supreme Court as to liability. The court "rejected [the insurer's] argument that the policy required physical damage to the insured's property, finding that the language 'loss of, damage to, or destruction of [the insured's] property or facilities' encompasses a 'loss of use' of the property." *Id.* at 5 (second alteration in original). The Appellate Division, First Department, however, reversed. It noted that the burden is on the insured to show that the policy covers the loss, and held that the trial court erroneously had shifted the burden of proof to the insurer. *Id.* at 6. It further held that the insured had not carried its initial burden to show coverage. The policy, the Appellate Division noted, afforded coverage for "loss of, damage to, or destruction of property or facilities . . . contracted by the Insured for use in connection with such Production, *caused by the perils insured against*," and also provided that such "perils" included "all risks of *direct physical loss or damage to the [insured's] property*," not otherwise excluded. *Id.* at 6–7 (emphases added). Reading these two clauses together, the Appellate Division held, "the only conclusion that can be drawn is that the business interruption coverage is limited to losses involving physical damage to the insured's property." *Id.* at 7. The Appellate Division thus specifically repudiated the lower court's holding that the phrase "loss of" must include "loss of use of" the insured premises. It reasoned that "[t]he plain meaning of the words 'direct' and 'physical' narrows the scope of coverage and mandates the conclusion that losses resulting from off-site property damage do not constitute covered perils under the policy." *Id.* The Appellate Division further noted that other provisions of the policy, including the provision limiting losses to the period of time necessary to rebuild, repair or replace damaged or lost property, "support

12

the conclusion that coverage is limited to instances where the insured's property suffered direct physical damage." *Id.* at 7−8.

The critical policy language here—"direct physical loss or damage"—similarly, and unambiguously, requires some form of actual, physical damage to the insured premises to trigger loss of business income and extra expense coverage. Newman Myers simply cannot show any such loss or damage to the 40 Wall Street Building as a result of either (1) its inability to access its office from October 29 to November 3, 2012, or (2) Con Ed's decision to shut off the power to the Bowling Green network. The words "direct" and "physical," which modify the phrase "loss or damage," ordinarily connote actual, demonstrable harm of some form to the premises itself, rather than forced closure of the premises for reasons exogenous to the premises themselves, or the adverse business consequences that flow from such closure. *See Roundabout Theatre Co.*, 302 A.D.2d at 6 ("direct physical loss or damage" language in insurance policy "clearly and unambiguously provides coverage only where the insured's property suffers direct physical damage"); *see also* Couch on Insurance, § 148:46 (3rd ed. 2009) (defining "physical loss" as a requirement which is "widely held to exclude alleged losses that are intangible or incorporeal"); *id.* § 167:15 ("business interruption policies generally require some physical damage to the insured's business in order to invoke coverage"). This authority undermines, and the Court is unaware of authority supporting, Newman Myers's argument that "direct physical loss or damage" should be read to include to extend to mere loss of use of a premises, where there has been no physical damage to such premises. *See United Airlines, Inc. v. Ins. Co. of State of Pa.*, 385 F. Supp. 2d 343, 349 (S.D.N.Y. 2005), *aff'd* 439 F.3d 128 (2d Cir. 2006) ("The inclusion of the modifier 'physical' before 'damages' . . . supports [defendant's] position that physical damage is required before business interruption coverage is paid."); *Philadelphia*

13

*Parking Auth.*, 385 F. Supp. 2d at 287–88 (noting that "'direct physical' modifies both loss and damage," and therefore "the interruption in business must be caused by some physical problem with the covered property . . . which must be caused by a 'covered cause of loss'").

Although not necessary to the Court's decision on this point, other provisions of the policy at issue here support this interpretation. Under the "Loss of Utilities" provision, and under the general "Premises Coverage" provision of the "Business Income With Extra Expense For Law Firms" section, loss of business income and extra expense coverage is limited to "the period of restoration," not to exceed the applicable Limit of Insurance.[6] *See* Policy at CC 00108, 00113−114. The term "period of restoration," in turn, is defined as "the period of time that . . . begins[] immediately after the time of direct physical loss or damage by a covered peril to property," and "will continue until your operations are restored, . . . including the time required to," *inter alia*, "repair or replace property," *id.* at CC 00122. The words "repair" and "replace" contemplate physical damage to the insured premises as opposed to loss of use of it. *See United Airlines*, 385 F. Supp. 2d at 349 (policy language limiting coverage "for only such length of time [needed] to rebuild, repair or replace such part of the Insured Location(s) as has been damaged or destroyed" supports the notion that "physical damage is required before business interruption coverage is paid"); *Philadelphia Parking Auth.*, 385 F. Supp. 2d at 287 ("'Rebuild,' 'repair' and

---

[6] Under the "Ingress And Egress" provision, coverage is not limited to the "period of restoration," but rather to a period of "thirty (30) consecutive days . . . or whenever your business income coverage ends, whichever occurs first." Policy at CC 00109. However, the term "direct physical loss or damage," which appears in the "Ingress And Egress" provision, as well as the "Loss of Utilities" provision, should be construed to have a consistent meaning throughout the Policy. *See Two Farms, Inc. v. Greenwich Ins. Co.*, No. 12 Civ. 0050 (JGK), 2014 WL 53412, at *8 (S.D.N.Y. Jan. 7, 2014) (under New York law, "a word used by the parties in one sense will be given the same meaning throughout the contract in the absence of countervailing reasons") (internal quotation marks and citation omitted). Accordingly, the "period of restoration" language may aid the Court in defining the scope of business income loss coverage, even under the "Ingress And Egress" provision.

'replace' all strongly suggest that the damage contemplated by the Policy is physical in nature."); *see also Roundabout*, 302 A.D.2d at 8 (stating that, absent a physical damage requirement, a provision limiting coverage to the time necessary to "rebuild, repair, or replace" would "be meaningless"). By contrast, construing "direct physical loss or damage" to require actual, physical damage to the insured premises gives effect to all provisions of the Policy. *See Hester v. Navigators Ins. Co.*, 917 F. Supp. 2d 290, 296 (S.D.N.Y. 2013) (insurance contracts must be "read as a whole," giving "full meaning and effect to all of the contract's provisions") (internal quotation marks, alterations, and citations omitted); *see also Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 558 (2d Cir. 2000) ("In a situation of potential contract ambiguity, an interpretation that gives a reasonable and effective meaning to all terms of a contract is preferable to one that leaves a portion of the writing useless or inexplicable."); *accord United Airlines*, 385 F. Supp. 2d at 349.

For these reasons, Newman Myers has not met its burden of showing that the Policy covers its losses. Accordingly, Great Northern is entitled to summary judgment in its favor.

### C.     Flood Exclusion

Great Northern advances an alternative argument in support of summary judgment in its favor. It argues that, even if there were "direct physical loss or damage" to a covered premises as a result of the Hurricane Sandy-related power outage, Newman Myers still could not recover, because the Policy expressly excludes coverage for loss or damage caused by flooding. Def. Br. 11–16. Newman Myers disagrees, arguing that the flood exclusion does not apply under the circumstances here, *i.e.*, where the harm (Con Ed's decision to shut down power to lower Manhattan), was caused not by flooding itself, but by *anticipated* flooding at the Bowling Green facility. *See* Pl. Br. 7–8.

In light of the Court's ruling that there was no "direct physical loss or damage" and thus no covered loss under the Policy, the Court need not decide whether the flood exclusion indeed applies here. *Cf. Roundabout Theatre Co.*, 302 A.D.2d at 9 (because the insurer "is entitled to a declaration that the loss is not covered by its policy, . . . it is unnecessary for us to rule on the applicability of the governmental authority exclusion"). Nevertheless, in the interest of completeness, and in the event an appeal is taken, the Court briefly addresses Great Northern's claim that the flood exclusion applies.

In the Court's judgment, Great Northern has not carried its burden to show that the exclusion applies. Under New York law, "before an insurance company is permitted to avoid policy coverage, it must satisfy the burden which it bears of establishing that the exclusions or exemptions apply in the particular case, and that they are subject to no other reasonable interpretation." *Seaboard Sur. Co. v Gillette Co.*, 64 N.Y.2d 304, 311 (1984) (internal citations omitted); *accord Dean v. Tower Ins. Co.*, 19 N.Y.3d 704, 708 (2012). Exemptions from coverage are construed narrowly against the insurer. *See QBE Ins. Co. v. ADJO Contractme Corp.*, 976 N.Y.S.2d 534, 552 (2d Dep't 2013) ("Whenever an insurer wishes to exclude certain coverage from its policy obligations, it must do so in clear and unmistakable language, and an ambiguity in an exclusionary clause must be construed most strongly against the insurer.") (internal quotation marks, citations, and alterations omitted).

By their terms, the "Loss of Utilities" and "Ingress And Egress" provisions of the Policy at issue here exclude coverage where "the direct physical loss or damage is caused by or results from earthquake or flood." Policy at CC 00114, CC00109 (bold face omitted). The Policy also contains a separate flood exclusion provision, which excludes coverage for "loss or damage caused by or resulting from," *inter alia*, "waves, tidal water or tidal waves" or "rising,

overflowing or breaking of any boundary" of any natural or man-made body of water. *Id.* at CC 00087.

Here, it is undisputed that Con Ed preemptively shut down the power to the Bowling Green Network as Hurricane Sandy made its approach, before any flood damage was actually sustained at its Bowling Green facility. Con Ed's was a precautionary measure, to maintain the integrity of the utility network in the event of *future* flooding. Thus, the power outage Newman Myers complains of was not directly *caused by* flood, as that term is commonly understood. Although Great Northern argues that "flooding" and "concerns of imminent flood damage" were the reason for "the preemptive shutdown of power" to the Bowling Green Network, Def. Opp. Br. 14, those terms are not equivalent, and "[a]mbiguities in an insurance policy are to be construed against the insurer," *Dean*, 19 N.Y.3d at 708 (internal quotation marks and citation omitted). Construing the flood exclusion narrowly, as the Court must, Great Northern cannot meet its burden of proving that Newman Myers's losses would not be covered. Therefore, in the event the Court's coverage ruling were overturned, the Court's judgment would be that Newman Myers would prevail in this lawsuit.

## CONCLUSION

For the foregoing reasons, Great Northern's motion for summary judgment is granted and Newman Myers's motion is denied. The Clerk of Court is respectfully directed to terminate the motions pending at Dkt. 18 and 22, and to close this case.

SO ORDERED.

                                                                              _____
                                                                              Paul A. Engelmayer
                                                                              United States District Judge

Dated: April 24, 2014
           New York, New York